*in part J H L*

# STOCK PURCHASE AGREEMENT

Stock Purchase Agreement ("Agreement") dated as of February 4, 2000 between The Trustees of Columbia University in the City of New York, a New York corporation ("Columbia"), and Toev Medical Corporation, a Delaware corporation (the "Corporation").

A.    Concurrently with the execution of this Agreement, Columbia is entering into a License Agreement with the Corporation (the "License Agreement"), pursuant to which Columbia is licensing the rights to certain technology to the Corporation; and

B.    In partial consideration for the execution and delivery of the License Agreement by Columbia, the Corporation has agreed to issue to Columbia certain shares of the Corporation's capital stock in accordance with the terms and conditions of this Agreement.

C.    In consideration of the premises and the mutual representations, warranties, covenants and agreements contained in this Agreement, the parties to this Agreement agree as follows:

**SECTION 1.** Sale of the Shares.

1.1    Authorization of the Sale of Shares.  The Corporation has authorized the issuance and sale to Columbia of (a) an aggregate of one thousand (1,000) shares (the "Initial Shares") of the Corporation's common stock, $.01 par value (the "Common Stock"), and (b) such number of Additional Shares (as hereinafter defined and, together with the Initial Shares, the "Shares") as may be issuable pursuant to Section 5, in each case at a price per share equal to the par value of each such share, which price shall be deemed paid in partial consideration for the execution and delivery by Columbia of the License Agreement.

1.2    Sale of the Initial Shares.  Subject to the terms and conditions of this Agreement and in reliance upon the representations, warranties and agreements contained herein, the Corporation will issue and sell to Columbia, and Columbia will purchase from the Corporation, at the Closing (as hereinafter defined) the Initial Shares.

1.3    Closing.  The closing of the purchase and sale of the Initial Shares (the "Closing"), shall be held as promptly as practicable following the execution and delivery of this Agreement at 363 Engineering Terrace, Columbia University, New York, New York, or such other place as may be mutually agreed upon by the parties, upon a date (the "Closing Date") to be mutually agreed upon by the parties, and in any event within 10 days following the date hereof.

1.4    Closing Documents.  Within 30 days after the Closing and, similarly, within 30 days after any subsequent closing pursuant to Section 5, 6.7, 6.8 or 8 of this Agreement, the Corporation will deliver to Columbia an indexed, velobound set consisting of copies of the

00113238.4

-1-

executed Transaction Documents (or other applicable documents), together with all applicable exhibits, schedules and attachments, and all other documents executed and/or delivered in connection with such closing.

**SECTION 2.**    Representations and Warranties of the Corporation.  The Corporation represents and warrants to, and covenants and agrees with, Columbia as of the date of this Agreement, as of the Closing Date and as of the date of each subsequent issuance of Shares under this Agreement, as follows:

2.1    Organization and Good Standing.  The Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own and lease its properties, to carry on its business as presently conducted and as presently proposed to be conducted and to execute, deliver and perform this Agreement and the License Agreement and each other document or instrument to be executed and delivered by or on behalf of the Corporation in connection with the execution and delivery of this Agreement and the License Agreement (collectively, the "Transaction Documents"), and to consummate the transactions contemplated by the Transaction Documents.  True, correct and complete copies of the Certificate of Incorporation and By-laws of the Corporation are annexed to this Agreement as Exhibit 2.1.  The Corporation is authorized to do business and is in good standing as a foreign corporation in each jurisdiction the laws of which require it to be so qualified or in good standing.

2.2    Capitalization.

(A)    Authorized and Outstanding Shares.  Upon consummation of the purchase and sale of the Initial Shares at the Closing, (i) the authorized capital stock of the Corporation shall consist of forty thousand (40,000) shares of Common Stock, par value $.01 per share and 1,000 shares of Preferred Stock, par value $1 per share, of which 10,000 shares of Common Stock and no shares of Preferred Stock, respectively, shall be issued and outstanding, and (ii) all of such issued and outstanding shares will have been duly authorized, validly issued and outstanding, fully paid and non-assessable.

(B)    Holders; Options.  Schedule 2.2(B) annexed to this Agreement contains a true, correct and complete list, as of the date hereof and as of the Closing Date, of (i) the holders of the issued and outstanding shares of capital stock of the Corporation, including the number, class and, if applicable, series, of the shares held by each such holder, and (ii) the outstanding Common Stock Equivalents (as hereinafter defined) of the Corporation and each other contract, agreement, instrument, arrangement, understanding or proposed transaction pursuant to which the Corporation is or may become obligated to issue any shares of its capital stock, any Common Stock Equivalents or other securities of the Corporation, including the number, class and, if applicable, series of such shares and/or other securities and the holders of such securities or other persons entitled to the benefit of any of the foregoing.  Except as provided in this Agreement or as listed on Schedule 2.2(B), as of the date hereof and as of the Closing Date, there is no (A) preemptive right, anti-dilution right, right of first refusal, right of first offer, right of first

00113238.4

-2-

negotiation or any other similar right of any stockholder of the Corporation or other person or entity, to purchase or otherwise acquire securities of the Corporation, pursuant to any provision of law, the Certificate of Incorporation or By-laws of the Corporation any agreement to which the Corporation is a party, or otherwise (collectively, "Preemptive Rights") or (B) contract, agreement, instrument, arrangement, understanding, proposed transaction, restriction or Lien (including, without limitation, any proxy, voting agreement, voting trust, stockholders' agreement, registration rights agreement, stock purchase agreement, investor rights agreements or any similar arrangement) respect to any capital stock or other securities of the Corporation (whether or not outstanding), except as described in the Certificate of Incorporation of the Corporation or this Agreement.  Except as provided in this Agreement or as listed on Schedule 2.2(B), there is no judgment, order, writ, injunction or decree or law, rule or regulation (other than federal and state securities laws, rules and regulations) that restricts the transfer of the shares of capital stock of the Corporation.  As used in this Agreement, "Lien" shall mean any security interest, mortgage, pledge, lien, charge or other encumbrance.

    2.3    <u>Authorization of Transaction Documents and the Shares</u>.

    (A)    <u>Agreements</u>.  The execution, delivery and performance by the Corporation of, and the consummation by the Corporation of the transactions contemplated by, the Transaction Documents have been duly authorized by all requisite corporate action by or on behalf of the Corporation, and each of the Transaction Documents constitutes a valid and binding obligation of the Corporation, enforceable against the Corporation in accordance with its terms.

    (B)    <u>Shares</u>.  The offer, sale, issuance and delivery of the Shares have been duly authorized by all requisite corporate action by or on behalf of the Corporation and when so issued, sold and delivered, the Shares will be validly issued and outstanding, fully paid and nonassessable and not subject to any Preemptive Rights.

    2.4    <u>No Conflict</u>.  The execution, delivery and performance of, and the consummation of the transactions contemplated by, the Transaction Documents, including, without limitation, the offer, sale, issuance and delivery of the Shares pursuant to this Agreement, have not resulted and will not result in (a) any violation of, or default under, or conflict with, or constitute, with or without the passage of time, the giving of notice, any violation of, or default under or give rise to any right of termination, cancellation or acceleration under (i) any term or provision of the Corporation's Certificate of Incorporation or By-laws, (ii) any term or provision of any (A) contract, agreement, instrument or arrangement, understanding, or (B) judgment, order, writ, injunction or decree of any court, government agency or any arbitrator, in each case, to which the Corporation is a party or by which it or its properties or assets are bound, or (iii) any statute, rule or regulation applicable to the Corporation or its properties or assets, or (b) the creation of any Lien upon any of the properties or assets of the Corporation.

    2.5    <u>Consents and Approvals</u>.  No consent, approval, waiver or authorization of, or designation, declaration or filing with, any court, governmental authority or instrumentality or arbitrator or any other person or entity is required in connection with the valid execution,

delivery and performance of, and the consummation of the transactions contemplated by, any of the Transaction Documents by or on behalf of the Corporation, including, without limitation, the offer, sale, issuance or delivery of the Shares, except qualification (or taking such action as may be necessary to secure an exemption from qualification, if available) of the offer and sale of the Shares under applicable state securities or blue sky laws, which qualifications and other action, if required, will be duly accomplished in a timely manner.

    2.6    <u>Offering</u>. Subject to the accuracy of Columbia's representations in Section 3, the offer and sale of the Shares to be issued in conformity with the terms of this Agreement constitute transactions exempt from the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act"), and in compliance with all applicable state securities or blue sky laws.

    2.7    <u>Agreements: Action</u>.

    (A)    <u>Agreements</u>. Except for the Transaction Documents and as listed on Schedule 2.7(A) annexed to this Agreement, as of the date hereof and as of the Closing Date, there is no (i) contract, agreement, arrangement, understanding, instrument or proposed transaction, or (ii) judgment, order, writ, injunction or decree of any court, government agency or instrumentality or any arbitrator, in each case, to which the Corporation is a party or by which it or its properties or assets are bound which involves or may involve (A) obligations (contingent or otherwise) of, or payments to, the Corporation in excess of $10,000, (B) license of any patent, copyright, trade secret or other proprietary right to or from the Corporation, (C) provisions restricting or affecting the development, manufacture or distribution of the Corporation's products or services, or (D) indemnification by the Corporation with respect to any infringement of proprietary rights.

    (B)    <u>Action</u>. Prior to the date of this Agreement, the Corporation has not engaged in any business. Without limitation as to the foregoing, except as listed on Schedule 2.7(A), the Corporation has not, prior to the date of this Agreement, (i) declared or paid any dividends or authorized or made any distribution upon or with respect to any class or series of its capital stock, (ii) made any loans or advances to any person, or (iii) sold, exchanged or otherwise disposed of any of its assets or rights.

    (C)    <u>Subsidiaries</u>. As of the date hereof and as of the Closing Date, the Corporation has never owned or controlled and does not presently own or control, directly or indirectly, of record or beneficially, any capital stock or other ownership interest in any other business entity.

    2.8    <u>Title</u>. As of the date hereof and as of the Closing Date, the Corporation does not own or have a leasehold or other interest in any real property, nor does it own or lease any tangible personal property.

00113238.4

-4-

2.9    Intellectual Property. As of the date hereof and as of the Closing Date, except for its rights under the License Agreement, the Corporation has no patents, trademarks, service marks, trade names, copyrights, franchises, license agreements or other rights with respect to any intellectual property.

2.10    Legal Compliance. The Corporation is not in violation of, or in default under, and no event has occurred that would constitute, with or without the passage of time and/or the giving of notice, any violation or, or default under (i) any term or provision of the Corporation's Certificate of Incorporation or By-laws, (ii) any term or provision of any (A) contract, agreement, instrument, arrangement or understanding, or (B) judgment, order writ, injunction or decree of any court, government agency or instrumentality or any arbitrator, in each case, to which the Corporation is a party or by which it or its properties or assets are bound, or (iii) any statute, rule or regulation applicable to the Corporation or its properties or assets.

2.11    Litigation. There is no action, suit, proceeding or investigation pending against the Corporation or its assets or properties before any court, governmental agency or instrumentality or arbitrator (nor, to the best of the Corporation's knowledge, is there any basis for, or threat of, any of the foregoing). The Corporation is not a party or subject to the provisions of any judgment, order, writ, injunction or decree of any court, government agency or instrumentality or arbitrator. There is no action, suit, proceeding or investigation by the Corporation currently pending or which the Corporation intends to initiate.

2.12    Financial Statements.

(A)    Liabilities and Loss Contingencies. As of the date hereof and as of the Closing Date, the Corporation did not have any liability of any nature or any loss contingency (as such term is used in the Statement of Financial Accounting Standards No. 5), except as disclosed on Schedule 2.12 hereto.

(B)    Business Plan and Budget. The Corporation will provide Columbia with a copy of its business plan and budget when completed by the Corporation. The projections of future financial and operating performance contained in the budget, and the assumptions upon which such projections will be based, will be believed by the Corporation to be reasonable. In addition, the Corporation is not aware of any facts or circumstances that will render the budget unreasonable or unattainable, makes no representation and gives no such assurance that any such projection will be attained , that the budget will be adequate to meet the needs of the corporation and /or that the Business Plan will not be rendered obsolete as the business of the corporation develops.

2.13    Solvency. The Corporation has not admitted in writing its inability to pay its debts generally as they become due, filed or consented to the filing against it of a petition in bankruptcy or a petition to take advantage of any insolvency act, made an assignment for the benefit of creditors, consented to the appointment of a receiver for itself or for the whole or any substantial part of its property, or had a petition in bankruptcy filed against it, been adjudicated a bankrupt, or filed a

petition or answer seeking reorganization or arrangement under the federal bankruptcy laws or any other laws or of the United States or any other jurisdiction.

2.14    Related Party Transactions.    Except as listed on Schedule 2.14 annexed to the Agreement, as of the date hereof and as of the Closing Date, there is no contract, agreement, instrument, arrangement, understanding or proposed transaction between the Corporation and any of its officers, directors or affiliates (which term, as used in this Agreement, shall have the meaning set forth in Rule 405 under the Securities Act), or any relative of any officer, director or affiliate of the Corporation or the direct or indirect owner of an interest (other than an ownership of less than 1% of the voting stock in publicly held companies) in any business organization that is or was a competitor, supplier or customer of the Company

2.15    Brokers or Finders.    Columbia has not incurred, and will not incur, directly or indirectly, as a result of any action taken by the Corporation, any liability for any brokerage or finder's or agent's fee or commission or any similar charges in connection with the Transaction Documents.

2.16    Full Disclosure.    Neither the Transaction Documents nor any other disclosure, document or certificate made or delivered by or on behalf of the Corporation or any of its officers, directors or affiliates in connection with the Transaction Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements in this Agreement or in any other of the Transaction Documents not misleading.

**SECTION 3.**    Representations and Warranties of Columbia.    Columbia represents and warrants to, and covenants and agrees with, the Corporation, as of the date hereof, as of the Closing Date and as of the date of each subsequent issuance of Shares under this Agreement, as follows:

3.1    Investment Intent.    Columbia is acquiring the Shares for its own account, for investment and not with a view to the distribution thereof within the meaning of the Securities Act.

3.2    No Public Market.    Columbia understands that the Shares have not been registered or qualified under the Securities Act or any state securities laws, by reason of their issuance and sale in transactions exempt from the registration or qualification requirements of the Securities Act and applicable state securities laws.    Columbia acknowledges that reliance on said exemptions is predicated in part on the accuracy of Columbia's representations and warranties contained in the Agreement.    Columbia acknowledges and agrees that, subject to the other provisions of this Agreement, (a) the Shares being acquired by it hereunder must be held by Columbia indefinitely unless a subsequent disposition of the Shares is registered or qualified under the Securities Act and applicable state securities laws or is exempt from such registration or qualification, (b) there is no public market for the Shares, and (c) there can be no assurance that any such market will ever develop.

00113238.4

3.3    Economic Risk.  Columbia has no present need for liquidity in its investment in the Corporation and is able to bear the risk of that investment for an indefinite period and to afford a complete loss of that investment.

3.4    Accredited Investor.  Columbia represents and warrants to the Corporation that it is an "accredited investor" as defined in Regulation D promulgated under the Securities Act.

3.5    Brokers or Finders.  The Corporation has not incurred, and will not incur, directly or indirectly, as a result of any action taken by Columbia, any liability for any brokerage, finder's or agent's fee or commission or any similar charges in connection with the Transaction Documents.

3.6    Reliance:  Columbia represents and warrants that it has not relied on any written or oral representation of the Corporation or its officers and directors in making its investment decision with regard to the shares and has relied on its own investigation in making such determination.

**SECTION 4.**  Conditions Precedent to Closing.

4.1    Conditions Precedent to Closing by Columbia.  The obligations of Columbia to purchase and pay for the Initial Shares at the Closing are subject to the satisfaction of the following conditions on or prior to the Closing:

(A)    Corporate Proceedings; Consents, Etc.  All corporate and other proceedings to be taken and all consents, approvals, waivers, authorizations, designations, declarations or filings to be obtained or made by or on behalf of the Corporation on or prior to the Closing in connection with execution, delivery and performance of, and the consummation of the transactions contemplated by, the Transaction Documents shall have been taken or obtained and all documents relating to such matters shall be reasonably satisfactory in form and substance to counsel for Columbia, which shall have received all such originals or certified or other copies of such documents as it may reasonably request.

(B)    Representations; No Breach.  The representations and warranties of the Corporation contained in this Agreement shall be true and correct on and as of the Closing Date as if made on such date, and the Corporation shall not have breached any of its representations, warranties, covenants or agreements contained in any of the Transactions Documents.

(C)    Blue Sky Matters.  All consents, approvals, qualifications and/or registrations required to be obtained or effected under any applicable state securities or blue sky laws in connection with the issuance, offer, sale and delivery of the Shares shall have been obtained or effected (except for the filing of any notice following the Closing or in connection with any issuance of Additional Shares, as the case may be, which may be required following the Closing under applicable state securities or blue sky laws).

(D)    Deliveries.  The Corporation shall have delivered to Columbia (i) duly executed counterparts of the License Agreement, together with any schedules and exhibits to such

00113238.4

agreements and any other Transaction Documents required to be executed and delivered on or prior to the Closing Date, (ii) a stock certificate representing the Initial Shares, (iii) a certificate of the President or a Vice President of the Corporation as to (A) the Certificate of Incorporation and By-laws of the Corporation and resolutions of the Board of Directors of the Corporation with respect to the Transaction Documents, and (B) the satisfaction of the conditions set forth in this Section 4, (iv) a certificate of an executive officer or officers of the Company as to the incumbency of each officer of the Corporation executing any of the Transaction Documents and (v) such other documents and instruments as Columbia may reasonably request.

4.2    Conditions Precedent to Closing by the Corporation.  The obligations of the Corporation to issue and sell the Initial Shares at the Closing are subject to the satisfaction of the following conditions on or prior to the Closing:

(A)    Corporate Proceedings.  The execution, delivery and performance by Columbia of, and the consummation by Columbia of the transactions contemplated by, the Transaction Documents shall have been duly authorized by all requisite corporate action by or on behalf of Columbia.

(B)    Representations; No Breach.  The representations and warranties of Columbia contained in this Agreement shall be true and correct on and as of the Closing Date as if made on such date, and Columbia shall not have breached any of its representations, warranties, covenants or agreements contained in any of the Transaction Documents.

(C)    Deliveries.  Columbia shall have delivered to the Corporation duly executed counterparts of the License Agreement, together with any schedules and exhibits to such agreements and any other Transaction Documents to which Columbia is a party and which are required to be executed and delivered on or prior to the Closing Date.

**SECTION 5.**  Anti-Dilution Rights.

5.1    Funding Shares.  (A) Issuance of Funding Shares.  Without limitation as to the rights of Columbia set forth in Section 5.2, the Corporation shall, from time to time, issue to Columbia additional shares of Common Stock (the "Funding Shares"), at a per share price equal to the par value of each such share, which price shall be deemed paid in partial consideration for the execution, delivery and performance by Columbia of the License Agreement, such that the Common Stock held by Columbia shall equal ten percent (10%) of the issued and outstanding Common Stock, on a Fully-Diluted Basis (as hereinafter defined), at all times up to and through the achievement of the Funding Threshold (as hereinafter defined). The "Funding Threshold" shall mean the time (following the date of this Agreement) at which the Corporation has completed a financing, a portion of a financing ,or a series of related financings, or a series of related financings and a portion of a financing, in which it has sold and issued shares of its capital stock and/or raised research and development financing (other than research and development financing raised on or before the date two years after the date of this Agreement) with aggregate gross cash proceeds to the Corporation of at least $4 million. "Fully-Diluted Basis" shall mean that the total number of issued and outstanding shares of the

Corporation's Common Stock shall be calculated to include (a) the shares of Common Stock issuable upon exercise and/or conversion of all of the following securities (collectively, "Common Stock Equivalents"): all outstanding (a) securities convertible into or exchangeable for Common Stock, whether or not then convertible or exchangeable (collectively, "Convertible Securities"), (b) subscriptions, rights, options and warrants to purchase shares of Common Stock, whether or not then exercisable (collectively, "Options"), and (c) securities convertible into or exchangeable or exercisable for Options or Convertible Securities and any such underlying Options and/or Convertible Securities. Furthermore, Fully-Diluted Basis shall mean that the total number of issued and outstanding shares of the Corporation's Common Stock shall be calculated to exclude (a) Common Stock constituting not more than twelve (12%) of the outstanding Common Stock on a Fully-Diluted Basis to employees of the Corporation under stock option plans or other compensation arrangements, (b) securities issued to a seller of pressure sensor technology to the Corporation in consideration for such technology and (c) securities issued as consideration for the acquisition of another company by Corporation by merger, purchase of all or substantially all of the assets or other reorganization whereby Company shall become the owner of more than 50% of the voting power of such company.

      (B)    <u>Fractional Shares</u>. The Company shall issue such number of fractional shares upon any issuance of the Funding Shares as may be required pursuant to the provisions of Section 5.1.

      (C)    <u>Payment of Taxes</u>. The Corporation shall pay all expenses in connection with, and all taxes and other governmental charges (other than any thereof on, based on or measured by, the net income of the holder thereof) that may be imposed in respect of the issuance, sale or delivery of the Funding Shares. The Corporation shall not be required, however, to pay any tax or other charge imposed solely as a result of any transfer involved in the issue of any certificate for Funding Shares in any name other than that of Columbia.

    5.2    <u>Anti-Dilution Shares</u>. Without limitation to the rights set forth in Section 5.1 and Section 5.3, Columbia shall have the right to receive any additional Preemptive Rights (as defined in Section 2.2(B) hereof) on the same terms and conditions (including, without limitation, as to fractional shares and payment of taxes and expenses) as the most favorable such rights granted to any holder of securities of the Corporation that acquired such securities on or prior to, or in connection with, the achievement of the Funding Threshold (collectively, the "Anti-Dilution Rights"). The Corporation shall, from time to time, issue such additional shares of capital stock (the "Anti-Dilution Shares") and such other securities of the Corporation to Columbia as may be required to be issued pursuant to the Anti-Dilution Rights. The Anti-Dilution Shares, together with the Funding Shares and the Preemptive Rights Shares (as hereinafter defined) shall be referred to herein as the "Additional Shares."

    5.3    <u>Preemptive Rights</u>. Other than in connection with issuances of (a) Common Stock constituting not more than twelve (12%) of the outstanding Common Stock on a Fully-Diluted Basis to employees of the Corporation under stock option plans or other compensation arrangements, (b) Capital Stock issued in respect of stock splits, stock dividends or the like, (c) issuances of Common

Stock and Common Stock Equivalents covered by Section 5.1 and as to which Funding Shares have been issued to Columbia in accordance with Section 5.1, and (d) issuances of securities of the Corporation covered by Section 5.2 and as to which Anti-Dilution Shares and/or other securities of the Corporation have been issued to Columbia in accordance with Section 5.2, (e) securities issued to a seller of pressure sensor technology to the Corporation in consideration for such technology (f) securities issued as consideration for the acquisition of another company by Corporation by merger, purchase of all or substantially all of the assets or other reorganization whereby Company shall become the owner of more than 50% of the voting power of such company and (g) securities issued pursuant to the terms of this Agreement, if the Corporation proposes to issue, sell or exchange, offer to issue, sell or exchange, or reserve or set aside for issuance any additional shares of Common Stock or other capital stock of the Corporation ("Proposed Shares"), then the Corporation shall first deliver to Columbia a written offer to sell (the "Offer") to Columbia the following shares (the "Preemptive Rights Shares"):  (i) if the Proposed Shares consist of Common Stock or Common Stock Equivalents, such number of shares of Common Stock, as will cause Columbia to own a number of shares of Common Stock representing the same percentage of the outstanding shares of Common Stock of the Corporation on a Fully-Diluted Basis as was owned by Columbia immediately prior to such issuance, or (ii) if the Proposed Shares consist of capital stock that is neither Common Stock nor a Common Stock Equivalent, such number of shares of such capital stock as will cause Columbia to own the same percentage of the Proposed shares as the percentage of the outstanding shares of Common Stock on a Fully-Diluted Basis owned by Columbia immediately prior to such issuance.  The Offer shall specify the price and the terms and conditions of the Offer, including without limitation, the minimum and maximum limits on the amount of Offered Shares proposed to be sold by the Corporation and shall be irrevocable for a period of 20 days from the date the Offer is given to Columbia (the "Offer Period").  Columbia shall have the right to accept the Offer in whole or in part by giving written notice to the Corporation within the Offer Period setting forth the number of Preemptive Rights Shares or the percentage of the Offered Shares that Columbia elects to purchase ("Notice of Acceptance").  If, at the end of the Offer Period, Columbia elects to purchase less than all of the Offered Shares, then the Corporation may sell those Preemptive Rights Shares for which no Notice of Acceptance was received; provided that such sale shall be on the same terms and conditions as the Offer.

5.4    Additional Interests.  No additional shares of capital stock or other securities of the Corporation shall be issued, sold or exchanged in any transaction covered by Section 5.1, 5.2 or 5.3, unless and until the Corporation has complied with the applicable requirements of such Section.

5.5    Termination of Rights.  Columbia's rights to receive Anti-Dilution Rights and to the issuance of the Funding Shares shall terminate upon achievement by the Corporation of the Funding Threshold.  Columbia's rights to the issuance of shares pursuant to the Anti-Dilution Rights and Columbia's rights to purchase the Preemptive Rights Shares shall terminate upon the consummation by the Corporation of a Qualified Public Offering. As used in this Agreement, the term "Qualified Public Offering" shall mean a public offering of the Common Stock in which the outstanding shares of Common Stock are valued, based on the gross proceeds received by the Corporation in such offering and the percentage of the outstanding Common Stock sold in such offering after giving

00113238.4

-10-

effect to such offering) at $50 million on a Fully-Diluted Basis or which yields gross proceeds of $10 million or more; provided that the initial public offering price per share is at least six dollars ($6).

**SECTION 6.** Other Covenants of the Corporation.

6.1    Interested Transactions. The Corporation shall not buy, sell or lease any property or assets from, borrow from or lend to, or deal with or enter into any other transaction or agreement with any stockholder, officer or director, or any relative or affiliate of any of the foregoing, other than as approved by a majority of the disinterested directors of the Corporation (or, in the event the Corporation has only one disinterested director, as approved by such director) and on terms no less favorable to the Corporation than could be obtained in an arm's-length transaction with an unaffiliated third party.

6.2    Financial Statements. The Corporation shall furnish to Columbia (a) with respect to the six-month periods ending June 30, 2000 through June 30, 2002, semi-annual unaudited balance sheets and statements of income, stockholders' equity and cash flows of the Corporation for such six-month period and the portion of the Corporation's fiscal year then ended, setting forth the corresponding figures for such periods in the preceding year, if any, not later than 60 days after the end of each such six-month period, (b) commencing with respect to the quarter ending September 30, 2002, quarterly unaudited balance sheets and statements of income, stockholders' equity and cash flows of the Corporation for such quarter and the portion of the Corporation's fiscal year then ended, setting forth the corresponding figures for such periods in the preceding year, if any, not later than 60 days after the end of each fiscal quarter, (c) commencing with respect to the fiscal year of the Corporation ending December 31, 2000, annual audited financial statements, including a balance sheet and statements of income, stockholders equity and cash flows not later than 90 days after the end of each fiscal year, certified by the Corporation's independent public accounting firm, and (d) from time to time upon Columbia's request, such additional financial or other information as Columbia may reasonably request. Any such financial statements shall be on a consolidated basis, if during the applicable reporting period the Corporation has any subsidiaries that are required to be consolidated with the Corporation for financial reporting purposes. Notwithstanding the preceding provisions of this Section 6.2, the Corporation shall furnish such quarterly and annual financial statements to Columbia on any earlier date upon which they are made generally available to the other stockholders of the Corporation.

6.3    Other Information. The Corporation shall deliver to Columbia promptly after the occurrence of any such event, written notice and a description of any default or other event, including any litigation, which might have a material adverse effect upon the Corporation, its financial condition, results of operations, prospects or business.

6.4    Books and Records; Inspection. The Corporation shall keep complete records and books of account and report under all terms and provisions of this Agreement in accordance with generally accepted accounting principles consistently applied. At any time and from time to time, during regular business hours, and with reasonable notice, the Corporation shall permit representatives of Columbia's independent auditors and representatives of Columbia to examine and

00113238.4

-11-

make copies of its records and books of account, to inspect its properties and to discuss its affairs with its officers, directors and independent accountants during regular business hours and in a manner so as not to unreasonably interfere with the conduct of the corporation's business.

6.5   <u>Corporate Existence; No Impairment</u>.   The Corporation shall maintain the Corporation's corporate existence and any material qualifications in any jurisdiction required for the Corporation to conduct the type of business it is conducting in such jurisdiction for the period or periods during which such business is being conducted.  The Corporation shall not amend its Certificate of Incorporation without the prior written consent of Columbia, if such amendment would adversely affect the rights of Columbia as a stockholder of the Corporation.  The Corporation shall not, by amendment of its Certificate of Incorporation or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other action, avoid or seek to avoid the observance or performance of any of the terms and provisions to be observed or performed by it pursuant to this Agreement, but will at all times in good faith assist in the carrying out of all of such terms or provisions and in the taking of all such action as may be reasonably necessary or reasonably appropriate in order to protect the rights of Columbia under this Agreement against impairment.

6.6   <u>Rule 144 Compliance</u>.   With a view to making available the benefits of certain rules and regulations of the Securities and Exchange Commission (the "Commission") which may at any time permit the sale of the shares to the public without registration, 90 days after any registration statement covering a public offering of securities of the Corporation under the Securities Act shall have become effective and at all times thereafter when any Shares are not eligible for sale under Rule 144(k), the Corporation agrees to: (i) make and keep public information available, as those terms are understood and defined in Rule 144 under the Securities Act; (ii) use its best efforts to file with the Commission in a timely manner all reports and other documents required of the Corporation under the Securities Act and the Securities Exchange Act of 1934, as amended (the "Exchange Act"); (iii) furnish to each holder of Registrable Securities (as hereinafter defined) forthwith upon request a written statement by the Corporation as to Corporation's compliance with the reporting requirements of Rule 144 and of the Securities Act and the Exchange Act, a copy of the most recent annual or quarterly report of the Corporation, and such other reports and documents so filed by the Corporation as such holder may reasonably request in availing itself of any rule or regulation of the Commission allowing such holder to sell any Shares without registration; and (iv) use the Corporation's best efforts to satisfy the requirements of all such rules and regulations (including the requirements for current public information, registration under the Exchange Act and timely reporting to the Commission) as promptly as is reasonably possible after its first registered public offering.

6.7   <u>Co-Sale Rights</u>.

(A)   <u>Co-Sale Rights</u>.   If at any time prior to a Qualified Public Offering, any of the holders of issued and outstanding capital stock of the Corporation or outstanding Common Stock Equivalents listed on Schedule 2.2(b) to this Agreement, including, without limitation, any controlled affiliate (other than the Corporation) of any of such holders (collectively, the "Major Stockholders") desires to sell, assign or otherwise transfer all or any portion of the shares of

00113238.4

-12-

Common Stock owned by it of record or beneficially (including, for purposes of this Section 6.7, any shares of Common Stock issuable upon the exchange, conversion and/or exercise of any Common Stock Equivalents) to any person or entity (the "Purchaser") other than a transfer to an affiliate of such stockholder or, with respect to an individual stockholder, to a trust for the sole benefit of such stockholder and/or members of the immediate family of such stockholder, Columbia shall have the right to sell to the Purchaser, as a condition to such transfer by any of the Major Stockholders then proposing to transfer any shares of Common Stock owned by such Major Stockholders (collectively, the Transferring Major Stockholder"), at the same price per share and on the same terms and conditions as involved in such sale by such Transferring Major Stockholders, the same percentage of the Shares owned by Columbia as the shares to be sold by such Transferring Major Stockholders, to the Purchaser represent with respect to the shares of Common Stock owned by such Transferring Major Stockholders, immediately prior to the sale of any of the Transferring Major Stockholders' shares of Common Stock to the Purchaser.

(B)    Co-Sale Notice. Not later than 30 days prior to any such proposed transfer, each of the Transferring Major Stockholders shall furnish a notice to Columbia stating the name of the Purchaser, the number of shares such Transferring Major Stockholder desires to transfer and the proposed price (expressed in dollars) and terms of transfer (the "Proposed Terms"). Columbia shall have the right, within 15 days following its receipt of such notice, by written notice to the Corporation, to indicate whether it desires to have a proportionate number of the Shares transferred in the same transaction.

(C)    Sale of Shares. The Transferring Major Stockholders and Columbia (if it elects to exercise its rights under this Section 6.7) shall sell to the Purchaser all, or at the option of the Purchaser, any portion of the shares of Common Stock proposed to be sold by them at a price and upon other terms and conditions, if any, not more favorable to the Transferring Major Stockholders than those in the notice provided by the Transferring Major Stockholders under Section 6.7(A) above; provided, however, that any purchase of less than all of such shares by the Purchaser shall be made from the Transferring Major Stockholders and Columbia on a *pro rata* basis in proportion to the number of shares of Common Stock held by the Transferring Major Stockholders and Columbia. The terms of Section 6.7(A) (and the remaining provisions of this Section 6.7) shall be reinstated if the proposed price or Proposed Terms are more favorable to the Transferring Major Stockholders than those set forth in the notice provided by the Transferring Major Stockholders under Section 6.7(A) above.

(E)    Sale of Assets, Etc. If the Corporation shall sell all or substantially all of its assets, file a certificate of dissolution or commence a dissolution, liquidation, or winding-up, or shall commence or have commenced against it any action or proceeding for dissolution, liquidation or winding-up or shall take any corporate action in furtherance thereof, then, in each such case, the Corporation shall distribute any assets as may be legally distributed to the stockholders of the Corporation, including Columbia, following such event as promptly as practicable thereafter.

**SECTION 7.** Restrictions on Transfer.

00113238.4

-13-

7.1    Legend. Each certificate for the Shares and any shares of capital stock received in respect of the Shares, whether by reason of a stock split or share reclassification, a stock dividend on the Shares or otherwise, and each certificate for any such securities issued to subsequent transferees of any such certificate shall (unless otherwise permitted by law) be stamped or otherwise imprinted with a legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.    THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER SAID ACT."

7.2    Restrictions on Transfer. None of the Shares shall be sold, transferred, assigned, pledged, hypothecated or otherwise disposed of unless and until one of the following events shall have occurred:

(A)    Compliance with the Securities Act. The Shares are transferred pursuant to and in conformity with an effective registration statement filed with the Commission pursuant to the Securities Act or a valid exemption from registration under the Securities Act; or

(B)    Transfer to Affiliate. The Shares are transferred to an affiliate of the seller or a trust controlled by or for the benefit of the seller or any affiliate of the seller and such affiliate has delivered to the Corporation a written agreement making the representations and warranties set forth in Sections 3.1, 3.2, 3.3 and 3.4 and agreeing to be bound by the restrictions of this Section 7 with respect to the Shares so transferred.

7.3    Removal of Legend. The Corporation shall, and shall cause any stock transfer agent or registrar of the Corporation to, within 10 days of the lawful and proper request of any holder of any such certificate bearing any of the foregoing legends and the surrender of such certificate, issue a new stock certificate in the name of such holder without the foregoing legends if any of the Shares are transferred in accordance with Section 7.2.

**SECTION 8.**    Registration Rights.

8.1    Demand Registration Rights. If, on any one occasion during any period (a) commencing upon the earlier of (i) ten months after the initial public offering of securities of the Corporation, and (ii) the date that any securities of the Corporation are registered under the Exchange Act, and (b) during which any of the Shares are not eligible for sale under Rule 144(k) (the "Registration Period"), the Corporation shall receive a written request from Columbia and/or any of its transferees in accordance with the provisions of Section 7 (the "Eligible Holders") who in the aggregate own a majority of the total number of shares then included in the Registrable Securities (as hereinafter defined) (the "Majority Holders"), to register the sale of all or part of such Registrable Securities, the Corporation shall, as promptly as practicable, prepare and file with the Commission

a registration statement sufficient to permit the public offering and sale of the Registrable Securities through the facilities of all securities exchanges (including, without limitation, the Nasdaq SmallCap Market) on which such class of securities is then listed and the over-the-counter market, and will use all reasonable efforts through its officers, directors, auditors and counsel to cause such registration statement to become effective as promptly as reasonably practicable. Within three business days after receiving any request contemplated by this Section 1, the Corporation shall give written notice to all the other Eligible Holders, advising each of them that the Corporation is proceeding with such registration and offering to include therein all or any portion of any such other Eligible Holder's Registrable Securities; provided that the Corporation receives a written request to do so from any such Eligible Holder within 30 days after receipt by such holder of the Corporation's notice. As used herein, the term "Registrable Securities" shall mean the Shares, any equity securities issued in exchange for, or as a dividend or distribution upon, the Shares and any other shares of the capital stock of the Corporation owned by Columbia and any of its transferees in accordance with the provisions of Section 7.

    8.2    Form S-3 Registration Rights. In addition to the rights of the Eligible Holders under Section 8.1, if, at a time when Form S-3 is available for such registration, the Corporation shall receive from any Eligible Holder of a written request or requests that the Corporation effect a registration on Form S-3 of any such Eligible Holder's Registrable Securities, then the Corporation shall promptly give written notice of the proposed registration to all other Eligible Holders and, as soon as practicable, effect such registration and all such related qualifications and compliance (including under applicable state securities of "blue sky" laws) as may be requested or necessary to permit or facilitate the sale and distribution of all Registrable Securities as are specified in such request and any written requests of other Eligible Holders given within 30 days after receipt of such notice; provided that the Corporation shall not be required to effect more than one registration pursuant to this Section 8.2 with respect to shares with an aggregate anticipated offering price (at the time that the written requests of the other Eligible Holders referred to above have been received) of less than $5 million.

    8.3    "Piggyback Registration Rights. During the Registration Period, at any time that the Board of Directors of the Corporation shall determine to proceed with the preparation and filing of a registration statement under the Securities Act (other than a registration statement on Form S-8, Form S-4 or other limited purpose form) in connection with the proposed offer and sale of securities of the same class as the Registrable Securities by it and/or any of its security holders, the Corporation will give written notice of such determination to Eligible Holders. Upon the written request of the Eligible Holders within 10 days after the receipt of any such notice from the Corporation, the Corporation will, as requested by Eligible Holders, cause such Registrable Securities to be included in such registration statement, all to the extent requisite to permit the sale or other disposition by each of the Eligible Holders of the Registrable Securities being so registered. If any registration pursuant to this Section 8.3 shall be underwritten in whole or in part, the Corporation may require that the Registrable Securities requested for inclusion pursuant to this Section 8.3 be included in the underwriting on the same terms and conditions as the securities otherwise being sold through the underwriters, and that each of the Eligible Holders participating in such registration execute any customary agreement requested by such underwriters. In the event

00113238.4

-15-

that the Registrable Securities requested for inclusion by Eligible Holders pursuant to this Section 8.3, together with any other shares which also have "piggyback" registration rights (such shares and the Registrable Securities being collectively referred to as the "Requested Stock"), in the good faith judgment of the managing underwriter of such public offering as communicated to Columbia would reduce the number of shares to be offered by the Corporation or interfere with the successful marketing of the shares of stock offered by the Corporation, the number of shares of Requested Stock otherwise to be included in the underwritten public offering may be reduced *pro rata* (by number of shares) among the holders thereof requesting such registration; provided that shares of persons that are not exercising their registration rights with respect to such registration shall not be included in such registration unless all of the shares of the Eligible Holders requested to be included in such registration have been so included.

8.4    "Lock Up" Agreement.  If the Corporation undertakes an underwritten registration, such Eligible Holder shall enter into such "lock-up" agreement with respect to the sale of securities outside of such registration for a period not to exceed the lesser of six months or such shortest period of time (or no period of time) as is applicable to any other holder of securities of the Corporation that holds at least as many shares (of the same class as the Registrable Securities) as the Eligible Holders or any of the holders of issued and outstanding capital stock of the Corporation or outstanding Common Stock Equivalents listed on Schedule 2.2(b) to this Agreement, which agreement shall be upon the same customary terms and conditions as any such agreement being entered into by such other holders generally.

8.5    Registration Fees and Expenses.  The Corporation shall bear all expenses, including attorneys' and other professional fees and expenses, including the fees and expenses of counsel for the Eligible Holders, but excluding underwriting discounts and commissions, incurred in connection with any registration of securities pursuant to this Section 8.

8.6    Agreements Relating to Registration.  In connection with each registration of the Registrable Securities pursuant to this Section 8, the Corporation shall, as expeditiously as reasonably possible:

(A)    Effectiveness of Registration Statement.  Keep effective any registration or qualification contemplated by this Section 8 and from time to time amend or supplement each applicable registration statement, preliminary prospectus, final prospectus, application, document and communication for such period of time as shall be required to permit each of the Eligible Holders to complete the offer and sale of the Registrable Securities covered thereby; provided that, subject to Sections 8.6(D) and (E), the Corporation shall in no event be required to keep any such registration or qualification in effect for a period in excess of 120 days (or 180 days, in the case of any registration statement on Form S-3) from the date on which the Eligible Holders are first permitted to sell such Registrable Securities pursuant to such registration statement.

(B)    Copies of Registration Statement.  Furnish to each of the Eligible Holders such reasonable number of copies of the registration statement and of each amendment and supplement thereto (in each case, including all exhibits), and such reasonable number of copies of

00113238.4

-16-

each prospectus contained in such registration statement and each supplement or amendment thereto (including each preliminary prospectus), all of which shall conform to the requirements of the Securities Act and the rules and regulations thereunder as each of the Eligible Holders may reasonably request to facilitate the disposition of the Registrable Securities included in such registration.

(C)    "Blue Sky" Qualification.  Use its best efforts to register and qualify the Registrable Securities covered by any registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by any of the Eligible Holders and, with respect to a non-underwritten offering, prepare and file in those jurisdictions such amendments (including post-effective amendments) and supplements and to take such other actions as may be necessary to maintain such registration and qualification in effect during such periods as stated in Section 8.6(A) above, and to take all other actions necessary or advisable to enable the disposition of such securities in such jurisdictions; provided, however, that the Corporation shall not be required in connection therewith or as a condition thereto to qualify to do business, file a general consent to service of process or subject itself to general taxation in any such states or jurisdictions.

(D)    Correction of Prospectus.  Notify the Eligible Holders at any time when a prospectus relating to Registrable Securities covered by a registration statement is required to be delivered under the Securities Act, of the happening of any event as result of which the prospectus included in the registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.  The period during which the Corporation is required to keep any registration statement effective pursuant to Section 8.6(A) shall be extended by a period of time equal to the period from the date of the occurrence of any event described in the first sentence of this Section 8.6(D) until the Eligible Holders are notified by the Corporation, in writing, that the registration statement has been amended or supplemented to correct any such untrue statement or omission and that sales may be made thereunder.  The Corporation shall use its best efforts to promptly amend or supplement the registration statement to correct any such untrue statement or omission.

(E)    Stop Orders.  Notify the Eligible Holders upon the issuance by the Commission or any authority under applicable "blue sky" or state securities laws of any stop order suspending the effectiveness of the registration statement or the initiation of any proceedings for that purpose.  The period during which the Corporation is required to keep any registration statement effective pursuant to Section 8.6(A) shall be extended by a period of time equal to the period from the date of the issuance of any such stop order or the initiation of any such proceedings until the lifting of any such stop order or the termination of any such proceedings.  The Corporation will use its best efforts to prevent the issuance of any stop order and, if any stop order is issued, to obtain the lifting of such stop order at the earliest possible time.

(F)    Review of Registration Statement.  Permit the Eligible Holders' counsel to review the registration statement and all amendments and supplements thereto a reasonable period

of time prior to their filing and not file any document in a form to which such counsel reasonably objects.

        (G)     Listing. If the class of securities being registered is then listed on a National Securities Exchange or the Nasdaq SmallCap Market, use its best efforts to cause the Registrable Securities to be listed on such exchange if the listing of such Registrable Securities is then permitted under the rules of such exchange, or if such class of securities is not then listed on a national securities exchange, use its best efforts to cause the quotation of the Registrable Securities on the same exchanges, including, without limitation, the Nasdaq SmallCap Market, as other classes of capital stock of the Corporation are then listed and use its best efforts to cause the continued listing of the Registrable Securities, so long as the Registration Statement is effective under the Securities Act.

        (H)     Opinion of Counsel. Furnish each of the Eligible Holders with an opinion of its counsel to the effect that (i) the registration statement has become effective under the Securities Act and no order suspending the effectiveness of the registration statement, preventing or suspending the use of the registration statement, any preliminary prospectus, any final prospectus or any amendment or supplement thereto has been issued, nor has the Commission or any securities or blue sky authority of any jurisdiction instituted or threatened to institute any proceedings with respect to such an order, (ii) the registration statement and each prospectus forming a part thereof (including each preliminary prospectus), and any amendment or supplement thereto, complies as to form with the Securities Act and the rules and regulations thereunder, (iii) such counsel has no knowledge of any material misstatement or omission in such registration statement or any prospectus, as amended or supplemented and (iv) containing such opinions as are customary in transactions of such type.

        (I)     Underwriting Documents. Enter into a cross-indemnity agreement and a contribution agreement, each in customary form, with each underwriter, if any, and, if requested, enter into an underwriting agreement containing conventional representations, warranties, allocation of expenses and customary closing conditions, including, without limitation, opinions of counsel and accountants' cold comfort letters, with any underwriter who acquires any Registrable Securities, which, in the case of any registration pursuant to Section 8.1, shall be selected by the Corporation and shall be reasonably acceptable to the Majority Holders.

        (J)     Deliveries to Underwriters. At the request of counsel for the Eligible Holders furnish to the underwriters, if any, on the effective date of the registration statement and on the date that Registrable Securities are delivered for sale in connection with a registration pursuant to this Section 8, respectively, (i) an opinion, dated such date, of the counsel representing the Corporation for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters and (ii) a letter, dated such date, from the independent certified public accountants of the Corporation, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters. If any registration pursuant to Section 1 of this Appendix is not an underwritten offering, such opinion and letter shall be addressed and delivered to the Eligible Holders.

00113238.4

-18-

(K)    Other Actions. Take all other actions necessary to expedite and facilitate disposition by each of the Eligible Holders of the Registrable Securities pursuant to any registration statement.

8.7    Indemnification. In the event any Registrable Securities are included in a registration statement (each, a "Registration Statement") under this Section 8:

(A)    Indemnification by the Corporation. To the extent permitted by law, the Corporation will indemnify and hold harmless each of the Eligible Holders, the directors and officers of each of the Eligible Holders, each person, if any, who controls any of the Eligible Holders, any underwriter (as defined in the Act) selling securities pursuant to the Registration Statement, each officer and director of such underwriter and each person, if any, who controls any such underwriter within the meaning of the Act or Exchange Act against any losses, claims, damages, expenses or liabilities, joint or several, to which any of them may become subject under the Securities Act, the Exchange Act, other federal or state law or otherwise, insofar as such losses, claims, damages, expenses or liabilities (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon any of the following: (i) any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements to such registration statement or prospectus, or (ii) the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, the Corporation will reimburse each of the Eligible Holders and each such underwriter or controlling person, promptly as such expenses are incurred, for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, action or proceeding. The foregoing indemnification shall not apply with respect to any such statement or omission made in reliance upon and in conformity with written information furnished to the Company with respect to any Eligible Holder by or on behalf of such Eligible Holder expressly for inclusion in the Registration Statement, including any preliminary prospectus or final prospectus contained therein or any amendment or supplement to such registration statement or prospectus. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of such indemnified party.

(B)    Indemnification by the Eligible Holders. To the extent permitted by law, each Eligible Holder will indemnify and hold harmless the Corporation against any losses, claims, damages, expenses or liabilities to which it may become subject under the Securities Act, the Exchange Act, other federal or state law or otherwise, insofar as such losses, claims, damages, expenses or liabilities arise out of (i) any untrue statement of a material fact contained in the Registration Statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements to such registration statement or prospectus or (ii) the omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading, which untrue statement or omission was made in reliance upon and in conformity with written information

00113238.4

-19-

furnished to the Company with respect to such Eligible Holder by or on behalf of such Eligible Holder expressly for inclusion in the Registration Statement, including any preliminary prospectus or final prospectus contained therein or any amendment or supplement to such registration statement or prospectus.

(C)    Indemnification Procedure.  Promptly after receipt by an indemnified party under this Section 8.7 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 8.7 deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof with counsel satisfactory to the indemnifying party; provided, however, that an indemnified party shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnifying party, if, in the reasonable opinion of counsel for the indemnifying party, representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential conflicts of interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall relieve such indemnifying party of any liability to the indemnified party under this Section 8.7 only to the extent such failure is actually and materially prejudicial to its ability to defend such action, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 8.7.  The indemnification required by this Section 8.7 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, promptly as such expense, loss, damage or liability is incurred and is due and payable. Notwithstanding anything contained in this Agreement to the contrary, the indemnity agreement contained above in this Section 8.7 shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld.

(D)    Contribution.  To the extent any indemnification by an indemnifying party is prohibited or limited by law, each indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under this Section 8.7 to the extent permitted by law and on the basis of the relative fault of the parties; provided, however, that (i) no contribution shall be made under circumstances where the maker of such contribution would not have been liable for indemnification under the fault standards set forth in Sections 8.7(a) or (b), as the case may be, (ii) no seller of Registrable Securities guilty of fraudulent misrepresentation (within the meaning of Section 11 of the Securities Act) shall be entitled to contribution from any seller of Registrable Securities who was not guilty of such fraudulent misrepresentation, and (iii) contribution by any seller of Registrable Securities shall be limited in amount to the net amount of proceeds received by such seller from the sale of such Registrable Securities.

**SECTION 9.** Survival.  All representations and warranties shall survive the Closing indefinitely.  All statements contained in a certificate or other instrument delivered by the

00113238.4

-20-

Corporation and/or by Columbia pursuant to this Agreement in connection with the transactions contemplated by this Agreement shall constitute representations and warranties by the Corporation under this Agreement. All agreements contained herein shall survive indefinitely until, by their respective terms, they are no longer operative.

**SECTION 10.** Indemnification; Fees and Expenses. (A) The Corporation shall indemnify, defend and hold Columbia and any other Eligible Holder harmless against all liability, loss or damage, together with all reasonable costs and expenses related thereto (including reasonable legal and accounting fees and expenses), arising from the untruth, inaccuracy or breach of any of its representations, warranties, covenants or agreements contained in this Agreement, including, without limitation, reasonable legal fees incurred in enforcing the Corporation's obligations under this Agreement.

(B) Columbia shall indemnify, defend and hold the Corporation harmless against all liability, loss or damage (including reasonable legal and accounting fees and expenses) arising from the untruth or inaccuracy of any of its representations contained in Section 3 of this Agreement.

**SECTION 11**. Miscellaneous.

11.1    Remedies. In case any one or more of the covenants or agreements set forth in this Agreement shall have been breached by any party, the other parties may proceed to protect and enforce their respective rights either by suit in equity by action at law, including, but not limited to, an action for damages as a result of any such breach and/or an action for specific performance of any such covenant or agreement contained in this Agreement.

11.2    Successors and Assigns. This Agreement shall be binding upon, and inure to the benefit of the Corporation and Columbia and their respective successors and assigns; provided that this Agreement may not be assigned (other than by operation of law, as provided in the immediately following sentence) by the Corporation without Columbia's prior written consent, which consent will not be unreasonably withheld or delayed. The Corporation shall require any successor by merger, consolidation or otherwise to assume and agree to perform this Agreement in the same manner and to the same extent, except to the extent otherwise specifically provided in this Agreement, that the Corporation would be required to perform this Agreement if no such succession had taken place and, in such event, references in this Agreement to the Corporation shall be deemed to refer to such successor. All references in this Agreement to the Shares shall include any shares of capital stock issued in exchange for, whether in a merger consolidation or otherwise, or as a dividend or distribution upon, the Shares and, in such event, references to the Common Stock shall include such shares of capital stock as are issued upon such events to other holders of the Common Stock. The provisions of this Section 11.2 shall similarly be applicable to successive mergers, consolidations or other events by which a party succeeds to the rights of its predecessor hereunder, and to successive issuances of capital stock of the type described in the immediately preceding sentence.

11.3    Entire Agreement. This Agreement (including the Schedules, Exhibits and Appendix to this Agreement) and other writings delivered pursuant to this Agreement or which form a part of

this Agreement contain the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior and contemporaneous arrangements or understandings with respect to such subject matter.

11.4.     <u>Creditors' Rights:</u>  each representation or warranty made in or pursuant to this agreement regarding the enforceability of any contract shall be qualified to the extent that such enforceability may be effected by bankruptcy, insolvency and other similar laws or equitable principals (but not those concerning fraudulent conveyance).

11.5     <u>Notices</u>.  All notices, requests, consents and other communications to be given, delivered or otherwise made hereunder to any party shall be deemed to be sufficient if contained in a written instrument delivered in person against receipt, by overnight courier requiring a signature against delivery, or duly sent by first class registered or certified mail, postage prepaid, addressed to such party at the address set forth below or such other address as may hereafter be designated in writing by either party by like notice to the other:

    (A)    If to the Corporation, to:

    Dr. Arthur Schwartz
    393 Gloucester Street
    Englewood, New Jersey  07631

    With a copy to:

    Lawrence Obstfeld
    75 Pierrepont Street
    Brooklyn Heights, New York  11201

    (B)    If to Columbia, to:

    Executive Director
    Columbia Innovation Enterprise
    Columbia University
    Engineering Terrace, Suite 363, Mailcode 2206
    New York, NY 10027
    Attn:  Jack M. Granowitz

    with a copy to:

    Office of the General Counsel
    Columbia University
    110 Low Memorial Library, Mailcode 4308
    New York, NY 10027

00113238.4

All such notices, advices and communications shall be deemed to have been received on the date of delivery.

11.6    Changes. The terms and provisions of this Agreement may not be modified or amended, or any of the provisions hereof waived, temporarily or permanently, except with the written consent of the Corporation and Columbia.

11.7    No Waiver. No waiver of any breach, term or condition of this Agreement shall be deemed to be a waiver of any other or subsequent breach, term or condition, whether of like or different nature.

11.8    Severability. If any provision of this Agreement shall be held to be illegal, invalid or unenforceable, in any jurisdiction then such illegality, invalidity or unenforceability shall attach only to such provision in such jurisdiction and shall not in any manner affect or render illegal, invalid or unenforceable any other provision of this Agreement, and this Agreement shall be enforced out as if any such illegal, invalid or unenforceable provision were not contained herein.

11.9    Counterparts. This Agreement may be executed in any number of counterparts, and each such counterpart hereof shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

11.10    Headings. The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be part of this Agreement.

11.11    Construction. Except as the context may otherwise require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice-versa. References to Sections, Schedules, and Exhibits shall, unless otherwise specified, refer to the Sections of, and the Schedules and Exhibit to, this Agreement. References to any agreement or document are to such agreement or document as amended, supplemented or otherwise modified from time to time.

11.12    Governing Law. This Agreement shall be governed by New York Law applicable to agreements made and to be fully performed in New York, and without reference to the conflict of laws principles of any jurisdiction. The parties agree that any and all claims arising under this Agreement or relating thereto shall be heard and determined either in the United States District Court for the Southern District of New York or in the courts of the State of New York located in the City and County of New York, and the parties agree to submit themselves to the personal jurisdiction of those courts.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.]

00113238.4

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK

By:_____
Name: Jack M. Granowitz
Title:   Executive Director
             Columbia Innovation Enterprise


TOEV MEDICAL CORPORATION

By:_____
Name:
Title:


ACCEPTED AND AGREED:


_____
Stanley Gewirtz


_____
Dr. Joseph Gottesman


_____
Lawrence Obstfeld


_____
Dr. Arthur Schwartz


00113238.4

-24-

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK

By:_____
Name: Jack M. Granowitz
Title:   Executive Director
           Columbia Innovation Enterprise


TOEV MEDICAL CORPORATION

By: _____
Name: Lawrence Obstfeld
Title: President


ACCEPTED AND AGREED:


_____
Stanley Gewirtz


_____
Dr. Joseph Gottesman


_____
Lawrence Obstfeld


_____
Dr. Arthur Schwartz


00113238.4

-24-

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK

By:_____
Name: Jack M. Granowitz
Title:   Executive Director
           Columbia Innovation Enterprise


TOEV MEDICAL CORPORATION

By:_____
Name:
Title:


ACCEPTED AND AGREED:

_____
Stanley Gewirtz


_____
Dr. Joseph Gottesman


_____
Lawrence Obstfeld


_____
Dr. Arthur Schwartz


00113238.4

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.

THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK

By:_____
Name: Jack M. Granowitz
Title:  Executive Director
        Columbia Innovation Enterprise


TOEV MEDICAL CORPORATION

By:_____
Name:
Title:


ACCEPTED AND AGREED:


_____
Stanley Gewirtz


_____
Dr. Joseph Gottesman


_____
Lawrence Obstfeld


_____
Dr. Arthur Schwartz


00113238.4

-24-

IN WITNESS WHEREOF, the undersigned have duly executed this Agreement as of the date first above written.

THE   TRUSTEES   OF   COLUMBIA UNIVERSITY  IN  THE  CITY  OF  NEW YORK

By:_____
Name:  Jack M. Granowitz
Title:   Executive Director
           Columbia Innovation Enterprise

TOEV MEDICAL CORPORATION

By:_____
Name:
Title:

ACCEPTED AND AGREED:

_____
Stanley Gewirtz

_____
Dr. Joseph Gottesman

_____
Lawrence Obstfeld

_____
Dr. Arthur Schwartz

00113238.4

-24-

Exhibit 2.1

<u>Certificate of Incorporation and By-Laws of the Corporation</u>

Schedule 2.12 - <u>Liabilities and Loss Contingencies.</u>

i)      the Corporation borrowed $62,500 in the aggregate from Messrs. Gottesman, Obstfeld and Gewirtz; and consequently has long-term debt of $62,500 in the aggregate to Messrs. Gottesman, Obstfeld and Gewirtz.  This obligation contains early payment conditions in the event the Corporation raises $1,500,000.

ii)     the Corporation has incurred legal fees, costs and expenses, and costs of incorporation estimated at $5,000.

Iii)    the Corporation will reimburse various officers for prepaid travel to various Business Meetings and the forthcoming American Heart Association conference, estimated at $5,000.

00113746.1

## Schedule 2.14 - Related Party Transactions.

The Corporation intends to employ Dr. Arthur Schwartz on a full-time or part-time basis.
The Corporation intends to compensate Messrs. Gewirtz and Obstfeld for consulting services at a rate of $50,000 per annum upon receipt of funding.  Mr. Obstfeld will receive a fee for services rendered as an registered representative for services rendered to the company equal to one percent of financings.
The Corporation intends to engage Mr. Obstfeld as an employee.
Messrs. Gewirtz and Obstfeld intend to provide Dr. Artur Schwartz with the proxies to vote their shares.

00113746.1

Schedule 2.2(B) - <u>Holders; Options.</u>

Common Stock Outstanding

| | |
|---|---|
| Dr. Arthur Schwartz | 7,380 |
| Columbia University | 1,000 |
| Dr. Joseph Gottesman | 324 |
| Lawrence Obstfeld | 648 |
| Stanley Gewirtz | 648 |
| | 10,000 |

Warrants to Purchase Common Stock, board approved, but as yet unissued

| | |
|---|---|
| Dr. Joseph Gottesman | 90 |
| Lawrence Obstfeld | 180 |
| Stanley Gewirtz | 180 |
| | 450 |

Interparty Agreement

Messrs. Obstfeld, Gewirtz and Gottesman have agreed to transfer an aggregate of 180 shares to Dr. Schwartz if the Corporation does not obtain certain funding threshold(s).

00113746.1

Schedule 2.7(A) - <u>Agreements.</u>

i)      the Corporation has long-term debt of $62,500 in the aggregate to Messrs. Gottesman, Obstfeld and Gewirtz.